1
2
3
4
5
6
7
8
9
10

11        **UNITED STATES DISTRICT COURT**

12             EASTERN DISTRICT OF CALIFORNIA

13

MARK ANTHONY GONZALES,              1:11-CV-02122 LJO GSA HC
14
                    Petitioner,       FINDINGS AND RECOMMENDATION
15                                     REGARDING PETITION FOR WRIT OF
                                       HABEAS CORPUS
16         v.

17   T. VIRGA, Warden,

18                    Respondent.
                                           /
19   _____

20        Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus

21   pursuant to 28 U.S.C. § 2254.

22                              **BACKGROUND**

23        Petitioner is currently in the custody of the California Department of Corrections and

24   Rehabilitation pursuant to a judgment of the Superior Court of California, County of Tulare,

25   following his conviction by jury trial on December 12, 2008, of first degree murder (Cal. Penal

26   Code § 187(a)).  (CT[1] 338; Resp't's Answer, Ex. A.)  The jury further found that Petitioner had

27

28
        ───────────────
        [1]"CT" refers to the Clerk's Transcript on Appeal.

1  personally and intentionally discharged a firearm during commission of the murder (Cal. Penal

2  Code § 12022.53).  (Id.)  On January 9, 2009, Petitioner was sentenced to serve an indeterminate

3  term of fifty years to life. (Id.)

4      Petitioner timely filed a notice of appeal.  On October 21, 2010, the California Court of

5  Appeal, Fifth Appellate District ("Fifth DCA"), affirmed Petitioner's judgment in a reasoned

6  decision.  (Resp't's Answer, Ex. A.)  Petitioner then filed a petition for review in the California

7  Supreme Court. (Lodged Doc.[2] 12.)  On January 26, 2011, the petition was summarily denied.

8  (Lodged Doc. 13.)

9      On December 23, 2011, Petitioner filed a federal habeas petition in this Court.  The

10  petition was dismissed with leave to amend on January 31, 2012.  On June 15, 2012, Petitioner

11  filed the instant First Amended Petition.  The petition presents the following grounds for relief:

12  1) There was insufficient evidence to find Petitioner guilty of murder; 2) There was insufficient

13  evidence to find Petitioner acted with premeditation and deliberation; 3) The trial court erred in

14  admitting into evidence a prior inconsistent statement, in violation of Petitioner's rights under the

15  Confrontation Clause; 4) The trial court erred in admitting into evidence a prior consistent

16  statement, in violation of Petitioner's rights under the Confrontation Clause; 5) The trial court

17  erred in failing to sua sponte instruct on third party culpability, and defense counsel was

18  ineffective for failing to request same; and 6) The trial court erred in failing to sua sponte modify

19  the consciousness of guilt instructions to include third party culpability evidence, and defense

20  counsel was ineffective for failing to request same.  On October 5, 2012, Respondent filed an

21  answer to the petition.  Petitioner did not file a traverse.

22                          **STATEMENT OF FACTS**[3]

23      On April 28, 2007, sometime after midnight, Timothy Steelman was shot while at
    Noe Vasquez's house. At the time, that house was being used daily by people buying and
24  using methamphetamine and marijuana. A group of seven or eight individuals, including
    appellant, Jesse Key, Edgar Chambers, and Steelman were in the front yard on the night

25

26      [2]"Lodged Doc." refers to the documents lodged by Respondent with his answer.

27      [3]The Fifth DCA's summary of the facts in its October 21, 2010, opinion is presumed correct. 28 U.S.C.
28  §§ 2254(d)(2), (e)(1).  Petitioner does not present clear and convincing evidence to the contrary; thus, the Court
    adopts the factual recitations set forth by the Fifth DCA.

in question when appellant turned and either hit or kicked Steelman, knocking him to the ground. While Steelman was trying to get up, he said either "no, Mark," or "no, Marcus," right before someone shot him. Vasquez's next door neighbor heard a gunshot come from the Vasquez house sometime between midnight and 2:00 a.m.

After he was shot, Steelman got up and ran through some bushes at the side of the house. His body was discovered the following day in the neighboring yard. He was wearing only one shoe. A bullet, described as a "small" projectile, had hit the left side of his chest, striking his heart, and he most likely had lived less than 10 minutes after being shot.

Rayette Worgull, a long-time friend and former girlfriend of appellant's who lived at the Vasquez residence, was there on the night of the shooting. Although she earlier had told a police officer she saw appellant with a gun, she claimed at trial that she was confused when she made the statement and it was instead a man named Ian she had seen with a gun. According to Worgull's testimony at trial, Key, Steelman and appellant were in a room smoking when Key accused Steelman of "burning" him on a dope deal and of stealing his cell phone. Worgull overheard Key on the phone stating he needed some .22-caliber shells. A few of the people in the house, including Steelman, went outside, but Worgull did not see appellant go out. Worgull remained inside and heard a bang. Key came back into the house and told Worgull he had let off a firecracker to scare the neighbor boys.

The following day, Worgull saw Key walking around with one of Steelman's shoes, saying Steelman would not be stealing anyone's cell phone again. Key also had a chain necklace and a pair of sunglasses belonging to Steelman.

Sheila Wilkerson, who lived with Key at the Vasquez residence, testified that she did not remember much about the incident because she had been using drugs at the time. She did remember being at the house with Key, Steelman and another individual when appellant arrived. The group left the room, and she heard someone say that two people were scuffling. She headed to the door and heard Key say, "Mark, no," and a gunshot, but she did not see anything herself and did not know how much time passed between Key's comment and the gunshot. She remembered that she had seen appellant with a gun two days before the incident. At that time, appellant left the gun in the room where Key was present. On the evening of the shooting, appellant did not have a gun in the room.

Edgar Chambers was present at the house at the time of the shooting and testified at trial. After smoking a "blunt," according to Chambers, he headed out the door of the residence behind Key and appellant. Chambers saw appellant hit Steelman, knocking him down. Steelman said, "no, Mark" or "no, Marcus," and Chambers heard a little pop. Steelman then got up and left. Appellant turned and walked away. When Chambers heard the pop, he did not see a muzzle flash or anything in appellant's hands. The pop sounded like a firecracker, but he later thought it sounded like a gunshot. During the incident, Chambers was not paying attention to Key and did not see what Key had in his hands. Chambers later told a friend that appellant tried to shoot someone, but that Chambers thought he missed.

Ian Gonzalez, a friend of Steelman's, spent time at the Vasquez residence every weekend. He testified at trial that, although he did not recall when, he had seen appellant with a gun. At one point, appellant had asked Gonzalez to hold the gun while he retrieved his bicycle. Gonzalez had held the gun for 10 to 15 minutes. Gonzalez did not know if it was a real gun or a pellet gun.

Between 7:00 and 8:30 on the morning after the shooting, appellant arrived at

Michael McCowan's house. McCowan testified that, while appellant was there, appellant told McCowan he had been in an altercation with Steelman the previous night and had kicked him in the groin. Appellant asked McCowan if he could leave "a piece or something" on the shelf in the hallway. McCowan said "[Y]eah, as long as you take it with you when you leave." But McCowan testified that he never saw appellant with a gun. Appellant had shaved his face while at McCowan's home. He had been unshaven when he arrived.

Detective Gale Watson testified that he spoke to Joe Avila, who told Watson that on April 30, 2007, while both Avila and appellant were in jail, appellant told Avila he was in custody on a murder charge. Avila had known appellant for years. Appellant told Avila to go to his house, retrieve a gun and some ammunition from a tool pouch in the garage, and destroy all the items. But at trial, Avila denied knowing appellant or having met him while incarcerated. He denied giving a statement to Detective Watson.

Detective Watson conducted two searches of appellant's home after speaking with Avila: the first time on April 30, 2007, and the second on May 7, 2007. No firearms were found during either search. Officer James Kelly participated in the search of appellant's home on April 30, 2007, and found a Crosman BB/pellet gun resembling the description of the gun involved in Steelman's murder. The weapon was found in one of the bedrooms in the house. Indicia of appellant's belongings were found in another bedroom, and a leather holster was found in a third bedroom.

Detective Watson also spoke with Noe Vasquez, at whose home the shooting occurred. Vasquez told Watson that appellant told him he had a .22-caliber pistol or revolver. But at trial, Vasquez claimed that appellant never mentioned a gun to him, and Vasquez denied telling Watson that appellant asked for ammunition for a .22-caliber gun.

Jesse Key was called to testify by the defense but invoked his Fifth Amendment privilege and refused to testify. Jimmy Vanvalkenburg then testified that he spoke to Key while both were in jail and that Key told Vanvalkenburg that appellant did not kill Steelman. Instead, Key said, "Steelman was shot somewhere else by someone else, and two male gentlemen dropped the body next-door." When Vanvalkenburg asked Key, "'You know so much about this, did you fucking shoot him?'" Key responded, "'No one will ever know .'"

Rose Denny, an investigator for the district attorney's office, spoke with Key the day after the shooting, and he told her he had not witnessed the murder. Officer Juan Saenz arrested Key on September 7, 2007, after an unrelated incident. At that time, Key told the officer he had beaten a friend because he owed him money from a bad drug deal. In December of 2007, Key again spoke to Investigator Denny and this time told her he had witnessed the shooting and wanted to tell her what had happened. He then said he had seen appellant shoot Steelman.[3] Key told Denny that appellant fired two shots, the first after appellant kicked Steelman in the groin and caused him to fall backwards. Key stated he left after the first shot but subsequently heard a second shot.

FN 3. The court admonished the jury that Key's statement to the investigator could be used only to impeach the veracity of the statement Key made to Vanvalkenburg; it could not be used as evidence of appellant's guilt.

Investigator Denny spoke to Worgull several times right after the shooting. According to Denny, Worgull told her that appellant had a gun prior to the shooting and on the evening of the shooting had said, "'I'm going to get him,'" right after Steelman walked past appellant in the house. At trial, Worgull claimed she did not recall making this statement.

4

1  (Resp't's Answer, Ex. A.)

2  **DISCUSSION**

3  I.  Jurisdiction

4  Relief by way of a petition for writ of habeas corpus extends to a person in custody

5  pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws

6  or treaties of the United States.  28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor,

7  529 U.S. 362, 375 (2000).  Petitioner asserts that he suffered violations of his rights as

8  guaranteed by the U.S. Constitution.  The challenged conviction arises out of Tulare County

9  Superior Court, which is located within the jurisdiction of this Court.  28 U.S.C. § 2254(a); 28

10  U.S.C. § 2241(d).

11  On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act

12  of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its

13  enactment.  Lindh v. Murphy, 521 U.S. 320 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th

14  Cir. 1997), *cert. denied,* 522 U.S. 1008 (1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769

15  (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v.

16  Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's

17  enactment).  The instant petition was filed after the enactment of the AEDPA and is therefore

18  governed by its provisions.

19  II.  Standard of Review

20  Under the AEDPA, relitigation of any claim adjudicated on the merits in state court is

21  barred unless a petitioner can show that the state court's adjudication of his claim:

22
23  (1) resulted in a decision that was contrary to, or involved an unreasonable
      application of, clearly established Federal law, as determined by the Supreme
      Court of the United States; or

24  (2) resulted in a decision that was based on an unreasonable determination of the
      facts in light of the evidence presented in the State court proceeding.

25
26  28 U.S.C. § 2254(d); Harrington v. Richter, __ U.S. __, __, 131 S.Ct 770, 784, 178 L.Ed.2d 624

27  (2011); Lockyer, 538 U.S. at 70-71; Williams, 529 U.S. at 413.

28  As a threshold matter, this Court must "first decide what constitutes 'clearly established

Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.  In addition, the Supreme Court decision must "'squarely address [] the issue in th[e] case' or establish a legal principle that 'clearly extend[s]' to a new context to the extent required by the Supreme Court in . . . recent decisions"; otherwise, there is no clearly established Federal law for purposes of review under AEDPA. Moses v. Payne, 555 F.3d 742, 754 (9th Cir.2009), *quoting* Wright v. Van Patten, 552 U.S. 120, 125 (2008); see Panetti v. Quarterman, 551 U.S. 930 (2007); Carey v. Musladin, 549 U.S. 70 (2006).  If no clearly established Federal law exists, the inquiry is at an end and the Court must defer to the state court's decision. Carey, 549 U.S. 70; Wright, 552 U.S. at 126; Moses, 555 F.3d at 760.

If the Court determines there is governing clearly established Federal law, the Court must then consider whether the state court's decision was "contrary to, or involved an unreasonable application of," [the] clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts."  Williams, 529 U.S. at 412-13; see also Lockyer, 538 U.S. at 72.  "The word 'contrary' is commonly understood to mean 'diametrically different,' 'opposite in character or nature,' or 'mutually opposed.'" Williams, 529 U.S. at 405, *quoting* Webster's Third New International Dictionary 495 (1976). "A state-court decision will certainly be contrary to [Supreme Court] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in [Supreme Court] cases." Id. If the state court decision is "contrary to" clearly established Supreme Court precedent, the state decision is reviewed under the pre-AEDPA de novo standard. Frantz v. Hazey, 533 F.3d 724, 735 (9th Cir.2008) (en banc).

1    "Under the 'reasonable application clause,' a federal habeas court may grant the writ if

2    the state court identifies the correct governing legal principle from [the] Court's decisions but

3    unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

4    "[A] federal court may not issue the writ simply because the court concludes in its independent

5    judgment that the relevant state court decision applied clearly established federal law erroneously

6    or incorrectly.  Rather, that application must also be unreasonable." Id. at 411; see also Lockyer,

7    538 U.S. at 75-76.  The writ may issue only "where there is no possibility fairminded jurists

8    could disagree that the state court's decision conflicts with [the Supreme Court's] precedents."

9    Harrington, 131 S.Ct. at 784.  In other words, so long as fairminded jurists could disagree on the

10   correctness of the state courts decision, the decision cannot be considered unreasonable.  Id.  If

11   the Court determines that the state court decision is objectively unreasonable, and the error is not

12   structural, habeas relief is nonetheless unavailable unless the error had a substantial and injurious

13   effect on the verdict.  Brecht v. Abrahamson, 507 U.S. 619, 637 (1993).

14    Petitioner has the burden of establishing that the decision of the state court is contrary to

15   or involved an unreasonable application of United States Supreme Court precedent. Baylor v.

16   Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the

17   states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a

18   state court decision is objectively unreasonable. See LaJoie v. Thompson, 217 F.3d 663, 669 (9th

19   Cir.2000); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

20    AEDPA requires considerable deference to the state courts. "[R]eview under § 2254(d)(1)

21   is limited to the record that was before the state court that adjudicated the claim on the merits,"

22   and "evidence introduced in federal court has no bearing on 2254(d)(1) review." Cullen v.

23   Pinholster, __ U.S. __, __, 131 S.Ct. 1388, 1398-99 (2011).  "Factual determinations by state

24   courts are presumed correct absent clear and convincing evidence to the contrary." Miller-El v.

25   Cockrell, 537 U.S. 322, 340 (2003), citing 28 U.S.C. § 2254(e)(1).  However, a state court

26   factual finding is not entitled to deference if the relevant state court record is unavailable for the

27   federal court to review. Townsend v. Sain, 372 U.S. 293, 319 (1963), overruled by, Keeney v.

28   Tamayo-Reyes, 504 U.S. 1 (1992).

7

1   II.    Review of Claims

2          A.  Insufficient Evidence of Murder

3          Petitioner first alleges there was insufficient evidence to support the murder conviction.

4   This claim was first presented on direct appeal to the Fifth DCA.  The Fifth DCA denied the

5   claim in a reasoned decision.  (Resp't's Answer, Ex. A.)  Petitioner then raised the claim to the

6   California Supreme Court in a petition for review.  The California Supreme Court denied the

7   claim without comment or citation of authority.  (Lodged Doc. 13.)  When the California

8   Supreme Court's opinion is summary in nature, the Court must "look through" that decision to a

9   court below that has issued a reasoned opinion.  Ylst v. Nunnemaker, 501 U.S. 797, 804-05 & n.

10  3 (1991).  In this case, the appellate court analyzed and rejected the claim as follows:

11         Appellant contends there is insufficient evidence that he murdered Steelman.
        Specifically, appellant claims there is insufficient evidence that he shot Steelman and,
12      assuming he fired a shot at him, there is insufficient evidence that the shot hit him. We
        disagree.

13
        In reviewing a challenge to the sufficiency of the evidence, we "consider the
14      evidence in a light most favorable to the judgment and presume the existence of every
        fact the trier could reasonably deduce from the evidence in support of the judgment. The
15      test is whether substantial evidence supports the decision, not whether the evidence
        proves guilt beyond a reasonable doubt." (*People v. Mincey* (1992) 2 Cal.4th 408, 432;
16      see also *People v. Staten* (2000) 24 Cal.4th 434, 460.) Our sole function is to determine if
        any rational trier of fact could have found the essential elements of the crime present
17      beyond a reasonable doubt. (*People v. Bolin* (1998) 18 Cal.4th 297, 331; *People v. Ochoa*
        (1993) 6 Cal.4th 1199, 1206.) "Reversal on this ground is unwarranted unless it appears
18      'that upon no hypothesis whatever is there sufficient substantial evidence to support [the
        conviction].'" (*People v. Bolin, supra,* at p. 331.) "Substantial evidence" in this context
19      means "evidence which is reasonable, credible, and of solid value-such that a reasonable
        trier of fact could find the defendant guilty beyond a reasonable doubt." (*People v.*
20      *Johnson* (1980) 26 Cal.3d 557, 578.)

21         The standard of appellate review is the same in cases in which the People rely
        primarily on circumstantial evidence. (*People v. Bean* (1988) 46 Cal.3d 919, 932.)
22      "Although the jury is required to acquit a criminal defendant if it finds the evidence
        susceptible of two reasonable interpretations, one of which favors guilt and the other
23      innocence, it is the jury, not the appellate court, which must be convinced of his guilt
        beyond a reasonable doubt." (*People v. Millwee* (1998) 18 Cal.4th 96, 132.)

24
        Under the foregoing standard, there is substantial evidence to support the jury's
25      finding that appellant murdered Steelman. "Murder is the unlawful killing of a human
        being, ... with malice aforethought" (§ 187, subd. (a)) and requires both actus reus and
26      mens rea elements. (*People v. Concha* (2009) 47 Cal.4th 653, 663.) To satisfy the actus
        reus element, which appellant contests here, the defendant's act must be the proximate
27      cause of death. (*Ibid.*)

28         There is ample evidence in the record that it was appellant who shot Steelman.

Worgull told an officer that she had seen appellant with a gun prior to the shooting. Although Wilkerson did not recall many details of the incident, she did recall that she had seen appellant with a gun two days prior to the shooting. And prior to the shooting, appellant told Vasquez that he owned a .22-caliber revolver/pistol. On the night of the shooting, Worgull heard appellant say "'I'm going to get him'" in reference to Steelman. Chambers was with appellant and Steelman outside when he saw appellant hit Steelman, knocking him to the ground. Steelman said either "no, Mark" or "no, Marcus" to appellant before Chambers heard a pop, which he later thought could have been a gunshot. Chambers saw Steelman get up and run towards the side of the house. Chambers later told a friend appellant tried to shoot someone.

A gunshot was heard coming from the Vasquez house sometime between 12:00 a.m. and 2:00 a.m. the morning of the shooting. Steelman's body was found in the neighbor's yard the following evening, consistent with the direction in which he ran after being shot. It was determined that Steelman died from a small caliber gunshot wound to the chest and that he likely died within 10 minutes of having been shot.

There was also the evidence Detective Watson obtained from Avila while Avila was detained in jail with appellant within a week of the murder. Avila told Watson that appellant had told him he was in jail for murder and that he needed Avila to go to his house and retrieve a gun and ammunition hidden there and destroy them. Appellant thus manifested a consciousness of guilt.

There is sufficient evidence from which the jury could reasonably conclude that appellant shot Steelman and that the shot struck and killed him.

(Resp't's Answer, Ex. A.)

The United States Supreme Court has held that when reviewing an insufficiency of the evidence claim, a court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt.  Jackson v. Virginia, 443 U.S. 307, 319 (1979).  Sufficiency claims are judged by the elements defined by state law.  Id. at 324 n.16.  On federal habeas review, AEDPA requires an additional layer of deference to the state decision.  Juan H. v. Allen, 408 F.3d 1262, 1274 (9th Cir.2005).  This Court must determine whether the state decision was an unreasonable application of the Jackson standard.  Under California law, "[m]urder is the unlawful killing of a human being, or a fetus, with malice aforethought."  Cal. Penal Code § 187(a).

In this case, the state court reasonably determined that sufficient evidence supported the finding that Petitioner killed Steelman.  As noted by Respondent, Edgar Chambers testified that

he was present at the Vasquez home on the night in question. (RT[4] 256.)  Chambers stated he stepped outside with Petitioner and the victim into the front yard of the house. (RT 260.)  Chambers testified he then saw Petitioner hit the victim three or four times to the face, making contact at least once, which knocked the victim to the ground. (RT 261-262.)  Chambers testified that the victim then exclaimed, "No, Mark" or "No, Marcus," whereupon Chambers heard a firecracker-like pop sound come from the area where Petitioner was standing. (RT 262-263, 268-269.)  Chambers stated the victim then got up and ran through bushes heading into a neighbor's yard. (RT 263-265.)  Later, when Chambers met with Robert Creech, he told Creech that Petitioner had tried to shoot somebody, but thought he had missed.  (RT 294.)

In addition, on a prior occasion Petitioner told Noe Vasquez that he possessed a .22-caliber handgun.  (RT 326.)  Also on a prior occasion, Ian Gonzalez had seen Petitioner in possession of a small-sized gun while at Noe Vasquez's house.  (RT 337-338.)  At that time, Petitioner asked Ian Gonzalez to hold the gun for him for fifteen minutes while Petitioner returned to his house. (RT 341, 377.)  The bullet that was recovered from the victim was of a small caliber, which is consistent with a .22-caliber bullet.  (RT 350.)

Evidence was presented that Petitioner had met Joe Avila while he was in custody on the underlying charges.  (RT 316.)  Avila had known Petitioner for years.  (RT 316.)   Petitioner advised Avila that he was being held for murder, and he asked him to go to Petitioner's house, retrieve his gun from a tool pouch in the garage along with ammunition, and destroy it.  (RT 316.)

Detective Denny testified that prior to the incident, Petitioner had told Rayette Worgull that he was "going to get Tim."  (RT 377, 384-385.)  The day after the incident, Petitioner went to Michael McCowan's home.  (RT 360-362.)  Petitioner stated he got into an altercation with the victim on the night before. (RT 361-362.)  He then asked McCowan if he could leave a "piece" on a shelf in the hallway. (RT 362-363.)  He also asked McCowan's permission to shave himself while he was there, and then did so. (RT 364-365.)

---

[4]"RT" refers to the Reporter's Transcript on Appeal.

In light of this evidence, it cannot be said that the state court unreasonably determined there was sufficient evidence to support the finding that Petitioner killed the victim. The claim should be denied.

B. Insufficient Evidence of Premeditation and Deliberation

Petitioner next claims there was insufficient evidence to support the jury's finding that he acted with premeditation and deliberation.

This claim was also presented on direct appeal to the Fifth DCA where it was denied in a reasoned decision. (Resp't's Answer, Ex. A.) Petitioner then raised the claim to the California Supreme Court where it was summarily denied. (Lodged Doc. 13.) Therefore, the Court must "look through" the decision of the California Supreme Court to the reasoned decision of the appellate court. Ylst, 501 U.S. at 804-05 & n. 3. In rejecting the claim, the Fifth DCA stated:

> Appellant also contends that there is insufficient evidence that he acted with premeditation and deliberation. We disagree.
>
> First degree murder requires a finding of premeditation and deliberation. (§§ 187, subd. (a), 189.)
>
> "'"Deliberation" refers to careful weighing of considerations in forming a course of action; "premeditation" means thought over in advance. [Citations.] "The process of premeditation and deliberation does not require any extended period of time. 'The true test is not the duration of time as much as it is the extent of the reflection. Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.'"'" (*People v. Young* (2005) 34 Cal.4th 1149, 1182.)
>
> In *People v. Anderson* (1968) 70 Cal.2d 15, the Supreme Court articulated "guidelines to aid reviewing courts in analyzing the sufficiency of the evidence to sustain findings of premeditation and deliberation." (*People v. Perez* (1992) 2 Cal.4th 1117, 1125.) The guidelines are descriptive and "are not a sine qua non to finding first degree premeditated murder, nor are they exclusive." (*Ibid.;* see *People v. Thomas* (1992) 2 Cal.4th 489, 516-517.)
>
> From the cases it surveyed in *People v. Anderson,* the court identified three categories of evidence pertinent to the determination of premeditation and deliberation: "(1) facts about how and what defendant did *prior* to the actual killing which show that the defendant was engaged in activity directed toward, and explicable as intended to result in, the killing-what may be characterized as 'planning' activity; (2) facts about the defendant's *prior* relationship and/or conduct with the victim from which the jury could reasonably infer a 'motive' to kill the victim, which inference of motive, together with facts of type (1) or (3), would in turn support an inference that the killing was the result of 'a pre-existing reflection' and 'careful thought and weighing of considerations' rather than 'mere unconsidered or rash impulse hastily executed' [citation]; (3) facts about the nature of the killing from which the jury could infer that the *manner* of killing was so particular and exacting that the defendant must have intentionally killed according to a 'preconceived design' to take his victim's life in a particular way for a 'reason' which the

jury can reasonably infer from facts of type (1) or (2)." (*People v. Anderson, supra,* 70 Cal.2d at pp. 26-27.)

Regarding these categories the court in *Anderson* stated, "Analysis of the cases will show that this court sustains verdicts of first degree murder typically when there is evidence of all three types and otherwise requires at least extremely strong evidence of (1) or evidence of (2) in conjunction with either (1) or (3)." (*People v. Anderson, supra,* 70 Cal.2d at p. 27.)

Citing *People v. Anderson,* appellant contends the circumstances of the murder here do not show substantial evidence of the three factors that could establish premeditation and deliberation. Appellant asserts that the only evidence of any possible planning consisted of a statement that "may or may not have referred to Steelman, when appellant reportedly stated one or two nights prior to the instant shooting that he was 'gonna get him.'" He also argues that the single shot does not support a premeditated murder.

But, following the *Anderson* guidelines, we conclude the jury could reasonably have inferred from the evidence that Steelman's murder was premeditated and deliberate. First, there was evidence of planning. Several persons saw appellant with a gun at the Vasquez home within days of the murder. And on the evening before the murder took place, appellant told Worgull that he was "gonna get" Steelman.

Second, the manner in which appellant killed Steelman also demonstrates that his actions were deliberate and premeditated. Chambers testified that when he, appellant, and Steelman were outside together, appellant, without provocation, turned and hit Steelman, knocking him to the ground. While he was on the ground, Steelman said either "no, Mark" or "no, Marcus" right before firecracker or shot-type sounds came from the direction where appellant was standing. Appellant then turned and walked away.

From this evidence, the jury could reasonably infer that appellant brought a gun to the Vasquez house with the intent of killing Steelman. He did so by first knocking him to the ground and rendering him helpless, and then shooting him while Steelman begged him not to. These facts support the jury's finding that appellant deliberately and with premeditation murdered Steelman, and we reject appellant's claim to the contrary.

(Resp't's Answer, Ex. A.)

As previously set forth, in evaluating a sufficiency of the evidence claim, a reviewing court must determine whether, viewing the evidence and the inferences to be drawn from it in the light most favorable to the prosecution, any rational trier of fact could find the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 319 (1979). Sufficiency claims are judged by the elements defined by state law. Id. at 324 n.16. A reviewing federal court must determine whether the state decision was an unreasonable application of the Jackson standard.

The California Supreme Court has defined premeditation and deliberation as follows:

Deliberation refers to careful weighing of considerations in forming a course of action;

premeditation means thought over in advance. The process of premeditation and deliberation does not require any extended period of time.  The true test is not the duration of time as much as it is the extent of the reflection.  Thoughts may follow each other with great rapidity and cold, calculated judgment may be arrived at quickly.

People v. Young, 34 Cal.4th 1149, 1182 (2005).

Here, the evidence showed that Petitioner had possessed a gun in the days leading up to the murder.  On the evening before the incident, Petitioner had told Rayette Worgull that he was "going to get" the victim. (RT 377, 384-385.)  Therefore, there was sufficient evidence of planning.

The actual murder took place in a cold, calculated fashion.  Petitioner stood next to the victim for several minutes when, without provocation, he turned and struck the victim in the face thereby knocking him to the ground.  (RT 260-261.)  The victim then apparently pleaded for his life by stating "no, Mark," or "no, Marcus," whereupon Petitioner shot him and then walked away. (RT 268-269. 279.)  Given the lack of provocation and the victim's plea for life, there was ample evidence of deliberation and premeditation.

Accordingly, the state court decision was not an unreasonable application of the Jackson standard.  The claim should be rejected.

C.  Admission of Key's Prior Inconsistent Statement

Petitioner alleges the trial court erred in admitting the prior inconsistent statement made by Jessie Key to investigator Denny in violation of Petitioner's rights under the Confrontation Clause.

1.  Background

During the presentation of his defense, Petitioner called Jessie Key as a witness. (RT 435.)  When questioned regarding the crime, Key invoked his Fifth Amendment privilege and refused to testify. (RT 435.)  Petitioner then called Jimmy Vanvalkenburg to the stand.  (RT 437.)  The prosecution objected on hearsay grounds, but the objection was overruled.  (RT 437.)  The trial court determined that Vanvalkenburg's testimony qualified under hearsay exception as a declaration against interest pursuant to Cal. Evid. Code § 1230. (RT 437.)  Vanvalkenburg testified that he met Key in jail and had a discussion with him regarding the murder.  (RT 439.)

He stated that Key told him Petitioner "didn't do it." (RT 439.)  He stated Key then elaborated, stating that "Tim Steelman was shot somewhere else by someone else, and two male gentlemen dropped the body next-door to my aunt's and Noe Vasquez's house." (RT 439.)  Vanvalkenburg stated he then asked Key, "You know so much about this, did you fucking shoot him?" (RT 440.)  To which, Key apparently responded, "No one will ever know." (RT 440.)

Vanvalkenburg conceded that he had never met Key before, but he did know Petitioner, having lived in the same neighborhood for twenty years. (RT 438.)  He acknowledged his familiarity with Petitioner and his family for those twenty years, considering them "friendly neighbors." (RT 443.)  He further acknowledged that prior to meeting Key, he knew about the crime and that Petitioner was being charged for its commission. (RT 439.)

During rebuttal, the prosecution called police investigator Rose Denny regarding a statement she had obtained from Key in December of 2007.  (RT 452-453.)  Prior to her testimony, defense counsel objected on grounds of hearsay and Confrontation Clause.  (RT 454-457.)  The trial court overruled the objection and allowed Denny to testify. (RT 457.)  Denny then testified that Key had told her he had witnessed Petitioner shoot the victim. (RT 457.)  Denny stated that Key then identified Petitioner as the shooter from a photographic lineup.  (RT 457.)  The trial court then admonished the jury that Denny's testimony could not be used as evidence of Petitioner's guilt; it could only be used for the limited purpose of evaluating the veracity of Key's statements. (RT 458-459.)

*2. Analysis*

Petitioner presented this claim on direct appeal to the Fifth DCA and it was rejected in a reasoned decision.  (Resp't's Answer, Ex. A.)  Petitioner then raised the claim to the California Supreme Court where it was summarily denied.  (Lodged Doc. 13.)  The Court must "look through" the decision of the California Supreme Court to the reasoned decision of the appellate court.  Ylst, 501 U.S. at 804-05 & n. 3.  The Fifth DCA denied the claim as follows:

> Appellant's defense at trial was that Jesse Key, not appellant, was responsible for Steelman's death. The defense called Key as a witness, but Key refused to testify and claimed his Fifth Amendment privilege not to incriminate himself. Appellant then called Vanvalkenburg, who testified that he met Key when both were in jail and that Key told him appellant did not kill Steelman. According to Vanvalkenburg, Key told him

14

"Steelman was shot somewhere else by someone else, and two male gentlemen dropped the body next-door to ... Vasquez's house." Vanvalkenburg then asked Key, "'You know so much about this, did you fucking shoot him?'" to which Key reportedly replied, "'No one will ever know.'"

During rebuttal, the prosecution called Investigator Denny, who worked as a police officer at the time of the shooting. She testified that in December of 2007, Key told her he wanted to make a statement regarding the shooting. At that point in Denny's testimony, defense counsel objected on hearsay and confrontation clause grounds. The trial court overruled the objection and allowed Denny to testify that Key told her he had seen appellant shoot Steelman.

In a sidebar, the trial court noted that the statement should come in for the limited purpose of evaluating the credibility of the hearsay statement, but not as evidence to convict appellant. Defense counsel stated, "I agree with that. That's what the exception says it can be admitted for." The trial court then admonished the jury that the statements purportedly made by Key to Denny could be considered only to impeach the veracity of the statements Key made to Vanvalkenburg.

In subsequent jury instructions, the trial court again admonished the jury that the statements made by Key to Investigator Denny were for "the limited purpose of evaluating the believability of the statements of Jessie Keys [*sic* ] claimed to have been made to Jimmy Vanvalkenburg" and "cannot be used by you for any other purpose whatsoever."

Appellant now contends Key's statements to Investigator Denny were inadmissible because "prior inconsistent statements are only admissible if the declarant is available for cross-examination at trial." He also contends that the statements violated his right to confront witnesses against him. Respondent contends that the statements were admissible under Evidence Code section 1202, that no confrontation clause violation occurred, and that any possible error was harmless. We agree with respondent.

Evidence Code section 1202 states in part: "Evidence of a statement or other conduct by a declarant that is inconsistent with a statement by such declarant received in evidence as hearsay evidence is not inadmissible for the purpose of attacking the credibility of the declarant though he is not given and has not had an opportunity to explain or to deny such inconsistent statement or other conduct." Evidence Code section 1202 deals with the impeachment of a hearsay declarant whose hearsay statement is admitted into evidence even though the declarant does not testify at the trial. (See, e.g., *People v. Ruiz* (1998) 62 Cal.App.4th 234, 241.) "Section 1202 of the Evidence Code was drafted to ensure that the unavailability of a hearsay declarant would not prevent introduction of relevant evidence which would be admissible if the declarant was in court." (*People v. Marquez* (1979) 88 Cal.App.3d 993, 998.) The purpose of Evidence Code section 1202 is to assure fairness to the party against whom hearsay evidence is admitted without an opportunity to cross-examine. (*People v. Corella* (2004) 122 Cal.App.4th 461, 470.)

Appellant relies on *People v. Curl* (2009) 46 Cal.4th 339, where the Supreme Court found evidence inadmissible under Evidence Code section 1202. In *Curl,* the defendant was convicted of murdering Richard Urban after Urban failed to pay on a drug deal. The defendant's theory at trial was that Steven Farmer, and not the defendant, assisted Duane Holt in the murder. Farmer refused to testify, and the defense called an investigator who testified that he visited Farmer in custody, and Farmer told the investigator to convey a message to a member of his family to "get rid" of a pair of boots. The purpose of this evidence was to establish a consciousness of guilt on Farmer's part.

(*Id.* at p. 361.) In rebuttal, the prosecution called a detective who testified that Farmer had told him he spent the night of the murder at his parents' house. The trial court admitted the testimony, over a defense hearsay objection, as a prior inconsistent statement under Evidence Code section 1235. (*Curl, supra,* at p. 361.)

On appeal, the defendant in *People v. Curl* argued that the trial court erred in admitting the testimony under Evidence Code section 1235 because that section applies only when "'the [prior] statement is inconsistent with [the witness's] testimony *at the hearing* ...'" (Evid.Code, § 1235) and in this case, Farmer did not testify. The Attorney General conceded, but argued that the statement was admissible under Evidence Code section 1202 and, in any event, any possible error was harmless. (*People v. Curl, supra,* 46 Cal.4th at p. 361.)

Our Supreme Court in *People v. Curl* found Evidence Code section 1202 inapplicable as well. "Farmer's statement was not hearsay but simply verbal conduct consisting of a directive that was neither inherently true nor false," and the statement was offered for the nonhearsay purpose of demonstrating consciousness of guilt. (*People v. Curl, supra,* 46 Cal.4th at p. 362.) Evidence Code section 1202 was not applicable because Farmer was "not a 'hearsay declarant'" and therefore there was no basis upon which to permit the detective's testimony. (*Curl,* at p. 362.)

The distinction here is that Key's statement to Vanvalkenburg was hearsay, an out-of-court statement offered for the truth of the matter asserted. Key's statement to Investigator Denny was therefore admissible under Evidence Code section 1202, as an inconsistent statement allowed for the limited purpose of attacking the credibility of the declarant.

We also reject appellant's reliance on *Crawford v. Washington* (2004) 541 U.S. 36 (*Crawford* ) and his contention that Key's statement to Investigator Denny violated his right to confront witnesses against him. In *Crawford,* the high court held that a testimonial statement from a witness who does not appear at trial is inadmissible against the accused unless the witness is unavailable to testify and the defendant had a prior opportunity to cross-examine the witness. (*Id.* at p. 59.) But the rule of *Crawford* only applies to testimonial statements that were introduced to establish the truth of the matter asserted. (*Ibid.;* accord, *Davis v. Washington* (2006) 547 U.S. 813, 823 [confrontation clause applies only to testimonial hearsay].) As *Crawford* acknowledges, when an out-of-court statement is introduced not for the truth of the matter asserted but for some other nonhearsay purpose, the confrontation clause is not implicated. (*Crawford, supra,* at p. 59, fn. 9 ["The (Confrontation) Clause ... does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted"] .)

In reaching that conclusion, the *Crawford* court relied on *Tennessee v. Street* (1985) 471 U.S. 409 (*Street* ). In *Street,* the high court analyzed the prosecution's use of an accomplice's confession at trial to rebut the defendant's testimony "that his own confession was coercively derived from the accomplice's statement." (*Id.* at p. 410.) The court noted that "[t]his case is significantly different from the Court's previous Confrontation Clause cases ... [where] hearsay evidence was admitted as substantive evidence against the defendants." (*Id.* at p. 413.) "In this case," the court further noted, "the prosecutor did not introduce [the accomplice's] out-of-court confession to prove the truth of [the accomplice's] assertions ... [but] to rebut [the defendant's] testimony that his own confession was derived from [his accomplice's]." (*Ibid.*) Accordingly, the court held that "[t]he *nonhearsay* aspect of [the accomplice's] confession-not to prove what happened at the murder scene but to prove what happened when [the defendant] confessed-raises no Confrontation Clause concerns." (*Id.* at p. 414.) Moreover, the jury in *Street* was "pointedly instructed by the trial court 'not to consider the truthfulness of [the

16

accomplice's] statement in any way whatsoever.'" (*Street,* at pp. 414-415.) "The assumption that jurors are able to follow the court's instructions fully applies when rights guaranteed by the Confrontation Clause are at issue." (*Id.* at p. 415, fn. 6.)

Here, as in *Street,* the out-of-court statement from the hearsay declarant-Key's statement to Investigator Denny-was not offered for the truth of the matter asserted; it was offered to impeach the credibility of Key's statement to Vanvalkenburg. And here, too, the jury was specifically instructed, twice in fact, that Key's statements to Investigator Denny were not to be considered for the truth of the matter asserted. When the evidence was first introduced, the trial court stated, in relevant part:

> "[I]nsofar as these claims are concerned purportedly made by Mr. Key, this evidence is coming in for a limited purpose and a limited purpose only. [¶] It may be considered to impeach the veracity of the statement purportedly made by Mr. Key to ... [¶] ... [¶] ... Vanvalkenburg. It cannot be used in any way as evidence of guilt of [appellant] in this matter. [¶] Again, it can only come in for the limited purpose of impeaching, if it does, the credibility or veracity of the claimed out-of-court statement made by Mr. Key."

And during instructions, the trial court again cautioned the jury:

> "Without diminishing the other times during the trial when I cautioned you as to the limited purpose for which certain evidence was admitted, I direct you to the testimony of Investigator Denny this afternoon relating to certain statements claimed to have been made to her by Jessie Key in December of 2007. Those statements came in for the limited purpose of evaluating the believability of the statements of Jessie Keys [*sic* ] claimed to have been made to Jimmy Vanvalkenburg. The statement of Jessie Keys [*sic* ] to Detective Denny cannot be used by you for any other purpose whatsoever."

We assume the jury followed the court's instruction fully. (*Street, supra,* 471 U.S. at p. 415, fn. 6.)

Appellant contends, however, that Key's statement to Investigator Denny violated the confrontation clause because the jury would have been unable to disregard the statement's substantive content despite the court's limiting instruction, similar to cases in which *Aranda/Bruton* error occurs. In *Aranda,* dealing with out-of-court statements by codefendants, the California Supreme Court rejected the notion that the admission of a nontestifying defendant's confession inculpating a codefendant is rendered harmless to the nonconfessing defendant by an instruction that it should not be considered against him or her. (*Aranda, supra,* 63 Cal.2d at p. 526.) In *Bruton,* decided just a few years after *Aranda,* the United States Supreme Court held that introduction of an incriminating extrajudicial statement by a nontestifying codefendant violates the defendant's right to cross-examination, even if the jury is instructed to disregard the statement in determining the defendant's guilt or innocence. (*Bruton, supra,* 391 U.S. at p. 137.) The Supreme Court reasoned that, even when so instructed, jurors cannot be expected to ignore the statements of one defendant that are "powerfully incriminating" as to another defendant. (*Id.* at pp. 135-136.)

Appellant relies on *People v. Song* (2004) 124 Cal.App.4th 973 (*Song* ), in which both *Aranda/Bruton* and *Crawford* error occurred. The defendant there was convicted of kidnapping, sexual penetration, and sexual battery. The evidence showed that the defendant went to the victim's house and, with the help of codefendant Vang, pulled her into a car. Later, codefendant Lor also joined the group. They all traveled to various places before the victim got help from a bystander. The defendant sexually assaulted the

1    victim before her escape. (*Song,* at pp. 977-978.)

2            At trial, the victim's prior relationship with the defendant became an issue. An
3    officer who had interviewed the victim after the assault related a statement she gave that
     tended to show she was in the car with the defendant voluntarily. Another officer testified
4    that he spoke with the codefendants Vang and Lor after they were arrested and both of
     them said that the victim was in the car against her will. (*Song, supra,* 124 Cal.App.4th at
5    pp. 978-979.) The trial court instructed the jury not to consider each defendant's
     statements against the other defendants. (*Id.* at p. 984.)

6            On appeal, the court determined that admission of the statements by Vang and Lor
7    was both *Aranda/Bruton* error and *Crawford* error and that the limiting instruction was
     "insufficient to eliminate *Crawford* error." (*Song, supra,* 124 Cal.App.4th at p. 984.) "As
8    the *Bruton* court recognized, 'there are some contexts in which the risk that the jury will
     not, or cannot, follow instructions is so great, and the consequences of failure so vital to
9    the defendant, that the practical and human limitations of the jury system cannot be
     ignored.'" (*Id.* at p. 984, quoting *Bruton, supra,* 391 U.S. at p. 135.)

10           The *Song* court then applied the test of *Chapman v. California* (1967) 386 U.S. 18
11   and determined that, while the statements of Vang and Lor were harmless beyond a
     reasonable doubt as to the charged sex offenses, they were prejudicial as to the
12   kidnapping charge because the statements were the only evidence related to the central
     question whether the victim went with the defendant voluntarily. (*Song, supra,* 124
13   Cal.App.4th at p. 985.)

14           Appellant contends the only distinction between his situation and those in which
     *Aranda/Bruton* is applicable is that, in his case, Key was not named as a defendant,
15   though he was clearly subject to scrutiny as the perpetrator. We agree that the
     circumstances are similar with regard to the efficacy of a limiting instruction.
16   Nevertheless, we find no prejudicial error. Even assuming arguendo that Investigator
     Denny's statement should not have been admitted, even for its limited purpose, we
17   conclude that admission of the statement did not so prejudice appellant that his conviction
     must be reversed. The admission of an extrajudicial statement in violation of *Crawford*
18   and a defendant's rights under the confrontation clause is subject to the harmless error
     analysis of *Chapman v. California, supra,* 386 U.S. 18. (*People v. Harrison* (2005) 35
19   Cal.4th 208, 239; cf. *People v. Anderson* (1987) 43 Cal.3d 1104, 1128 ["It is established
     ... that *Bruton-Aranda* error is not prejudicial per se," but rather, "such error must be
20   scrutinized under the harmless-beyond-a reasonable-doubt standard of *Chapman v.
     California* "].)

21           Any prejudice arising from Key's statement to Investigator Denny must be
     examined in context. That context, of course, includes Key's statements to
22   Vanvalkenburg. Defense counsel introduced these statements hoping to cast suspicion on
     Key. Counsel was aware of Evidence Code section 1202 and knew that Key's statement to
23   Denny would become admissible. Yet counsel apparently made a tactical decision that the
     risk of prejudice was not too great. We do not disagree. From his totally inconsistent
24   statements, the jury most likely concluded that Key was not a credible witness for either
     party. In the circumstances, we find any error that occurred harmless beyond a reasonable
25   doubt.

26   (Resp't's Answer, Ex. A. (footnotes omitted).)

27           The Confrontation Clause of the Sixth Amendment gives a defendant the right "to be

28   confronted with the witnesses against him."  U.S. Const. amend. VI.  This right extends to

                                              18

1   defendants in state as well as federal criminal proceedings. <u>Pointer v. Texas</u>, 380 U.S. 400

2   (1965). In <u>Crawford v. Washington</u>, 541 U.S. 36, 53-54 (2004), the United States Supreme

3   Court held that the Confrontation Clause bars the admission of testimonial hearsay unless the

4   declarant is unavailable and the accused had "a prior opportunity for cross-examination." The

5   <u>Crawford</u> holding abrogated, in part, the prior rule that the admission of testimonial hearsay did

6   not violate the Confrontation Clause if the declarant was unavailable and the statement fell under

7   a "firmly rooted hearsay exception" or otherwise bore indicia of reliability. <u>Ohio v. Roberts</u>, 448

8   U.S. 56, 66 (1980). "Although <u>Crawford</u> did not define 'testimonial' or 'nontestimonial,' it made

9   clear that the Confrontation Clause was concerned with 'testimony,' which 'is typically [a]

10  solemn declaration or affirmation made for the purpose of establishing or proving some fact,' and

11  noted that '[a]n accuser who makes a formal statement to government officers bears testimony in

12  a sense that a person who makes a casual remark to an acquaintance does not.'" <u>Delgadillo v.</u>

13  <u>Woodford</u>, 527 F.3d 919, 927 (9th Cir. 2008), *quoting* <u>Crawford</u>, 541 U.S. at 51 (first alteration

14  in original) (internal quotation marks omitted). Later, in <u>Michigan v. Bryant</u>, 562 U.S. __, __,

15  131 S.Ct. 1143, 1155 (2011), the Supreme Court determined that a statement is testimonial if

16  made "with a primary purpose of creating an out-of-court substitute for trial testimony."

17  The Confrontation Clause also does not bar statements introduced for a non-hearsay purpose.

18  <u>Tennessee v. Street</u>, 471 U.S. 409, 414 (1985); <u>Crawford</u>, 541 U.S. at 59 n. 9.

19          In this case, Key's statement to Denny was introduced for the non-hearsay purpose of

20  attacking Key's credibility. It was not introduced to establish the truth of the matter asserted. In

21  fact, the jury was twice instructed that the statement was not to be considered for its truth, but

22  only for the limited purpose of evaluating Key's statement to Vanvalkenburg. (RT 459, 469.)

23  Since the statement was introduced for a non-hearsay purpose, the Confrontation Clause is not

24  implicated. <u>Street</u>, 471 U.S. at 414. Therefore, the state court did not act contrary to or

25  unreasonably apply clearly established Supreme Court precedent.

26          Even if introduction of Key's statement to Denny was error, Petitioner fails to

27  demonstrate that the error had a substantial or injurious effect in determining the jury's verdict.

28  <u>Brecht v. Abrahamson</u>, 507 U.S. 619, 637-38 (1993). To begin with, the jury was instructed not

1    to consider the statement for its truth but only for the limited purpose of evaluating Key's

2    credibility.  Juries are presumed to follow their instructions.  <u>Aguilar v. Alexander</u>, 125 F.3d 815,

3    820 (9th Cir.1997).

4         Moreover, as previously recited, the evidence against Petitioner was strong.   An

5    eyewitness testified he saw Petitioner hit the victim knocking him to the ground. (RT 261-262.)

6    The witness testified the victim then pleaded, "No, Mark" or "No, Marcus," whereupon a

7    firecracker-like pop sound came from the area where Petitioner was standing. (RT 262-263, 268-

8    269.)  The witness stated the victim then got up and ran through bushes heading into a neighbor's

9    yard while Petitioner walked away. (RT 263-265.)  The witness later told another that Petitioner

10   had tried to shoot somebody.  (RT 294.)

11        There was also evidence that Petitioner had been in possession of a .22-caliber handgun,

12   and that the victim had been shot by a small-caliber handgun.  (RT 326, 337-338, 350.)  Further,

13   evidence was presented that while Petitioner was being held for the murder, he asked an

14   individual to go to Petitioner's house, retrieve his gun from a tool pouch in the garage along with

15   ammunition, and destroy it.  (RT 316.)

16        Additionally, Detective Denny testified that prior to the incident, Petitioner had told

17   Rayette Worgull that he was "going to get Tim."  (RT 377, 384-385.)  The day after the incident,

18   Petitioner told Michael McCowan that he got into an altercation with the victim the night before.

19   (RT 361-362.)  He then asked McCowan if he could leave a "piece" on a shelf in the hallway.

20   (RT 362-363.)  He also asked McCowan's permission to shave himself while he was there, and

21   then did so. (RT 364-365.)

22        Therefore, in light of the strong evidence of Petitioner's guilt and the limiting instruction

23   with respect to Key's statement to Denny, the admission of Key's statement could not have had a

24   substantial or injurious effect or influence in determining the jury's verdict.  <u>Brecht</u>, 507 U.S. at

25   637-38.  The claim should be denied.

26        <u>D.  Admission of Avila's Prior Inconsistent Statement</u>

27        In his fourth claim for relief, Petitioner contends the trial court erred in admitting the

28   prior consistent statement made by Joe Avila to Detective Watson in violation of Petitioner's

rights under the Confrontation Clause.

*1. Background*

The prosecution called Joe Avila to testify about a statement he had made to Detective Watson concerning Petitioner while he and Petitioner were both in Tulare County Jail around May of 2007. (RT 298.)  Avila repeatedly denied that he had ever met Petitioner or that he had ever spoken to Detective Watson. (RT 298-302.)  On cross-examination, defense counsel elicited from Avila that he had been convicted of forgery and grand theft. (RT 302.)  Avila also testified that he knew Detective Watson because Watson had previously arrested him. (RT 302.)  Based on this prior contact, Avila stated he would know whether or not he had previously spoken to Watson. (RT 302-303.)

Later, the prosecution called Detective Watson who testified he made contact with Avila at the Tulare County Jail on May 5, 2007, and obtained a statement from him. (RT 312-313.) Watson testified that Avila was in custody on a grand theft charge. (RT 314.)  Watson testified that Avila informed him he had made contact with Petitioner while at the jail, and that Petitioner had directed Avila to "go to [Petitioner's] house, retrieve the gun from a tool pouch in the garage, along with the ammunition, and to destroy it." (RT 315.)  Watson also testified that Avila told him he had known Petitioner for years from living in town and being "family friends." (RT 316.)

*2. Analysis*

This claim was also raised on direct appeal to the Fifth DCA, where it was rejected in a reasoned decision. (Resp't's Answer, Ex. A.)  It was then raised to the California Supreme Court where it was summarily denied. (Lodged Doc. 13.)  The Court must "look through" the decision of the California Supreme Court to the reasoned decision of the appellate court. Ylst, 501 U.S. at 804-05 & n. 3.  In denying this claim, the appellate court stated:

> At trial, the prosecution called Avila to testify about a statement appellant purportedly made to him while both were in jail a few days after the murder. Avila denied knowing or meeting appellant and denied speaking to or making any statement to Detective Watson. Defense counsel questioned Avila as well and was able to elicit from him that he had previously been convicted of felony forgery and grand theft. Avila stated he knew who Watson was because the detective had previously arrested him. But Avila insisted he did not speak to Watson about appellant.
>
> The prosecutor then called Detective Watson, who testified that on May 5, 2007,

21

he obtained a statement from Avila that appellant, who also was in jail at the time, told Avila he was in custody for murder. Appellant then asked Avila to "go to his house, retrieve the gun from a tool pouch in the garage, along with the ammunition, and to destroy it." Avila also told Watson he had known appellant for years.

Appellant now contends that the trial court abused its discretion when it admitted evidence of Avila's statement to Detective Watson under the prior inconsistent statement exception to the hearsay rule, Evidence Code section 1235, because Avila's prior statement was not inconsistent with his trial testimony. We disagree.

Evidence Code section 1235 provides: "Evidence of a statement made by a witness is not made inadmissible by the hearsay rule if the statement is inconsistent with his testimony at the hearing and is offered in compliance with Section 770." Evidence Code section 770 provides:

"Unless the interests of justice otherwise require, extrinsic evidence of a statement made by a witness that is inconsistent with any part of his testimony at the hearing shall be excluded unless: [¶] (a) the witness was so examined while testifying as to give him an opportunity to explain or to deny the statement; or [¶] (b) The witness has not been excused from giving further testimony in the action."

When a witness does not recall or remember an event, there is no "inconsistency" within the meaning of Evidence Code section 1235. (*People v. Sam* (1969) 71 Cal.2d 194, 210; and see *People v. Price* (1991) 1 Cal.4th 324, 413-414.) But "'[w]hen a witness's claim of lack of memory amounts to deliberate evasion, inconsistency is implied." (*People v. Ledesma* (2006) 39 Cal.4th 641, 711; see also *People v. Green* (1971) 3 Cal.3d 981, 988-989, disapproved on another point in *People v. Chavez* (1980) 26 Cal.3d 334, 357.)

Appellant argues Avila did not recall his earlier statements, and there was no basis for an implied finding by the trial court that Avila was being deliberately evasive in his trial testimony.

We agree with respondent, however, that appellant has "mischaracterized" Avila's testimony. A review of the record shows that Avila, in his testimony, never stated he could not remember or recall what he told Detective Watson. Instead, he repeatedly and unequivocally denied he had spoken to Watson at all. His statement to Detective Watson was therefore properly admitted as a prior inconsistent statement under Evidence Code section 1235. (*People v. Ledesma, supra,* 39 Cal.4th at p. 710; *People v. Williams* (1997) 16 Cal.4th 153, 199.)

Appellant also contends that admission of Avila's prior inconsistent statement violated his Sixth Amendment right to confrontation. We disagree.

As noted earlier, in *Crawford, supra,* 541 U.S. 36, the United States Supreme Court "depart[ed] from the high court's established Sixth Amendment jurisprudence." (*People v. Rincon* (2005) 129 Cal.App.4th 738, 754.)

"Prior to *Crawford,* ... 'the Supreme Court had held that an unavailable witness's out-of-court statement against a criminal defendant could be admitted consistent with the [Sixth Amendment's] confrontation clause if it bore "adequate 'indicia of reliability.'" [Citation.] To qualify under that test, evidence had either to fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." [Citation.]'" (*People v. Geier* (2007) 41 Cal.4th 555, 597.)

In *Crawford,* the Supreme Court abandoned this approach and held that the confrontation clause prohibits "admission of testimonial statements of a witness who did not appear at trial unless [the witness] was unavailable to testify, and the defendant had had a prior opportunity for cross-examination." (*Crawford, supra,* 541 U.S. at pp. 53-54.)

The court in *Crawford* specifically addressed whether admission of prior statements of a trial witness violated the confrontation clause:

"[W]e reiterate that, when the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements. [Citation.] It is therefore irrelevant that the reliability of some out-of-court statements "'cannot be replicated, even if the declarant testifies to the same matters in court.'" [Citation.] The Clause does not bar admission of a statement so long as the declarant is present at trial to defend or explain it." (*Crawford, supra,* 541 U.S. at p. 59, fn. 9.)

Avila was present at trial and available for cross-examination by appellant. The admission of Avila's prior statements, therefore, did not violate the confrontation clause.

(Resp't's Answer, Ex. A.)

It is clear that the state court rejection of Petitioner's claim was not contrary to or an unreasonable application of Supreme Court law. As previously stated, the Supreme Court held in Crawford that the Confrontation Clause bars the admission of testimonial hearsay unless the declarant is unavailable and the accused had "a prior opportunity for cross-examination." 541 U.S. at 53-54. However, "[w]hen the declarant appears for cross-examination at trial, the Confrontation Clause places no constraints at all on the use of his prior testimonial statements." Id. at 59 n. 9. Here, Avila testified at trial and was cross-examined. Therefore, Petitioner's claim fails and should be denied.

E. Instruction on Third Party Culpability

Next, Petitioner claims he was prejudiced by the trial court's failure to sua sponte instruct on third party culpability. He further claims defense counsel was ineffective in failing to request such instruction.

Petitioner presented this claim on direct appeal to the Fifth DCA, and it was denied in a reasoned decision. (Resp't's Answer, Ex. A.) Petitioner then presented it to the California Supreme Court where it was summarily denied. (Lodged Doc. 13.) The Court must "look through" the decision of the California Supreme Court to the reasoned decision of the appellate court. Ylst, 501 U.S. at 804-05 & n. 3. The Fifth DCA denied the claim as follows:

1

Appellant notes that the heart of his defense was a third party culpability theory, namely "that Key had both motive, opportunity and actions taken to kill Steelman...." Further, according to appellant, the trial court was obliged to instruct the jury, sua sponte, on application of the reasonable doubt standard to this affirmative theory. Thus, the court was required to inform the jury that appellant had only to raise a reasonable doubt whether it was he or Key who committed the crime; he was not required to prove Key guilty to raise such reasonable doubt. The trial court's failure to so instruct, says appellant, violated his rights under the Fifth, Sixth and Fourteenth Amendments. In the alternative, appellant argues that trial counsel was ineffective in failing to request such an instruction. We disagree.

Appellant fails to cite the Supreme Court's opinions in either *People v. Gutierrez* (2009) 45 Cal.4th 789 or *People v. Abilez* (2007) 41 Cal.4th 472, in both of which the court rejected the precise argument appellant makes:

"'The applicable principles are clear. A criminal defendant may introduce evidence of third party culpability if such evidence raises a reasonable doubt as to his guilt, but the evidence must consist of direct or circumstantial evidence that links the third person to the crime. It is not enough that another person has the motive or opportunity to commit it. (*People v. Robinson* (2005) 37 Cal.4th 592, 625.) A trial court has a duty to instruct the jury "sua sponte on general principles which are closely and openly connected with the facts before the court." (*People v. Holt* [ (1997) ] 15 Cal.4th [619,] 688.) Finally, a trial court has a sua sponte duty to give instructions on the defendant's theory of the case, including instructions "as to defenses '"that the defendant is relying on ..., or if there is substantial evidence supportive of such a defense and the defense is not inconsistent with the defendant's theory of the case."'" (*People v. San Nicolas* (2004) 34 Cal.4th 614, 669.)' (*People v. Abilez, supra,* 41 Cal.4th at p. 517, italics omitted.) Defendant contends that the court erred by failing to give a pinpoint instruction along with the burden of proof instruction, arguing that CALJIC No. 2.90 does not adequately inform the jury regarding the burden of proof for a defendant's affirmative defenses.

"As an initial matter, defendant bore the burden of requesting a pinpoint instruction, and failed to do so. (See *People v. San Nicolas, supra,* 34 Cal.4th at p. 669.) A defendant is entitled to a pinpoint instruction, upon request, only when appropriate. (*People v. Saille* (1991) 54 Cal.3d 1103, 1119.) 'Such instructions relate particular facts to a legal issue in the case or "pinpoint" the crux of a defendant's case, such as mistaken identification or alibi. [Citation.] They are required to be given upon request when there is evidence supportive of the theory, but they are not required to be given sua sponte.' (*Ibid.,* citing *People v. Rincon-Pineda* (1975) 14 Cal.3d 864, 885; see also *People v. San Nicolas, supra,* 34 Cal.4th at p. 669.) We conclude that the court did not err by failing to instruct the jury, sua sponte, regarding third party culpability." (*People v. Gutierrez, supra,* 45 Cal.4th at p. 824; see *People v. Abilez, supra,* 41 Cal.4th at pp. 517-518.)

We are, of course, bound by both *Gutierrez* and *Abilez.* (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450, 455.)

Asserting federal as well as state error, appellant cites *Mathews v. United States* (1988) 485 U.S. 58, 63 for the proposition that "a defendant is entitled to an instruction as to any recognized defense for which there exists evidence sufficient for a reasonable jury to find in his favor." As the Supreme Court noted in *Abilez,* however, the instruction in *Mathews* was requested (*Mathews v. United States, supra,* at pp. 61-62), and so the case does not stand for the proposition that a sua sponte instruction is required under the

Constitution. (*People v. Abilez, supra,* 41 Cal.4th at p. 517.)

Neither does *People v. Simon* (1995) 9 Cal.4th 493, 501, upon which appellant also relies, afford him relief. In *Simon,* the defendant asserted an affirmative defense upon which he bore the burden on proof. The Supreme Court held it was error not to instruct the jury that the defendant had the burden of raising only a reasonable doubt through his affirmative defense. (*Id.* at pp. 500-502.) In contrast, in this case, the identity of the killer was not an affirmative defense appellant was required to prove. (Cf. *People v. Richardson* (1978) 83 Cal.App.3d 853, 862 [defense based on mistaken identity is not an independent, affirmative defense and, in the absence of a specific request for an instruction relating reasonable doubt to identification, it is sufficient that jury be instructed generally to consider all evidence], disapproved on other grounds in *People v. Saddler* (1979) 24 Cal.3d 671, 682, fn. 8.) The prosecution had the burden of proving appellant's guilt beyond a reasonable doubt, and the jury was fully instructed with CALCRIM No. 220 regarding that burden.

But appellant asserts defense counsel was ineffective in failing to request instruction on third party culpability. A defendant will prevail on an ineffective assistance of counsel claim only where the defendant is able to show that counsel's performance was deficient and the defendant would have obtained a more favorable result absent the deficiency. (*Strickland v. Washington* (1984) 466 U.S. 668, 687-688, 694.) Here, appellant would not have obtained a more favorable result had counsel requested and received the instruction he claims should have been given. The jury was instructed on reasonable doubt and burden of proof. In closing argument, defense counsel explained to the jury and argued forcefully that it was not his or appellant's "job to prove that Jessie Key did it. The prosecution has to prove that he didn't do it 'cause if there's a reasonable doubt there that Jessie Key might have done this, then that means not guilty because that's the burden of proof. That's the presumption of innocence." Had the jury believed appellant's assertion that it was Key who murdered Steelman, it could have acquitted appellant. (See *People v. Abilez, supra,* 41 Cal.4th at pp. 517-518 [error in failing to instruct sua sponte on third party culpability harmless because jury was instructed on reasonable doubt and burden of proof].)

Neither the trial court's failure to instruct sua sponte nor defense counsel's failure to request instruction was prejudicial.

(Resp't's Answer, Ex. A.)

*1. Alleged Failure by Trial Court to Instruct Sua Sponte*

Petitioner claims the trial court failed to sua sponte instruct the jury with respect to third party culpability.  As a preliminary matter, the Court notes that any error in the state court's determination of whether the instruction was necessary under state law cannot form the basis for federal habeas relief.  Estelle, 502 U.S. at 67-68.  "'Failure to give [a jury] instruction which might be proper as a matter of state law,' by itself, does not merit federal habeas relief." Menendez v. Terhune, 422 F.3d 1012, 1029, *quoting* Miller v. Stagner, 757 F.2d 988, 993 (9th Cir.1985).

To the extent Petitioner alleges a violation of due process, in order to obtain relief he

1    must demonstrate that the "alleged instructional error had substantial and injurious effect or

2    influence in determining the jury's verdict." Clark v. Brown, 450 F.3d 898, 905 (9th Cir.2006),

3    citing Brecht v. Abrahamson, 507 U.S. 619, 637 (1993); see also Beardslee v. Woodford, 358

4    F.3d 560, 578 (9th Cir.2004) (as amended).  A "substantial and injurious effect" means a

5    "reasonable probability" that the jury would have arrived at a different verdict had the instruction

6    been given. Clark, 450 F.3d at 916.   The burden on Petitioner is especially heavy "where ... the

7    alleged error involves the failure to give an instruction." Id. at 904.

8         In this case, the state court reasonably determined that the alleged failure to sua sponte

9    instruct on third party culpability was harmless.  The jury was fully instructed on reasonable

10   doubt and the prosecution's burden of proof.  Moreover, defense counsel specifically and

11   forcefully argued that it was not Petitioner's burden to prove Key committed the murder, but that

12   it was only necessary that the jury find a reasonable doubt based on Key's possible commission

13   of the crime to find Petitioner not guilty.  Given that the jury was instructed on the burden of

14   proof and reasonable doubt, and the jury was well aware of the defense theory based on defense

15   counsel's arguments, the alleged omission could not have had a substantial or injurious effect or

16   influence in determining the jury's verdict.  The claim should be rejected.

17        Moreover, as correctly argued by Respondent, Petitioner fails to demonstrate that the trial

18   court's failure was contrary to or an unreasonable application of Supreme Court precedent.  In

19   this case, defense counsel did not request the instruction.  Petitioner only points to the alleged

20   failure by the trial court to sua sponte provide such an instruction.  However, the Supreme Court

21   has not clearly established that a trial court is required under the Constitution to issue a defense

22   instruction sua sponte.  In Mathews v. Unites States, 485 U.S. 58, 63 (1988), the Supreme Court

23   held that "a defendant is entitled to an instruction as to any recognized defense for which there

24   exists evidence sufficient for a reasonable jury to find in his favor."  However, in Mathews, the

25   instruction at issue was specifically requested by the defense.  Here, defense counsel never

26   requested the instruction, and "[i]t is the rare case in which an improper instruction will justify

27   reversal of a criminal conviction when no objection has been made in the trial court." Henderson

28   v. Kibbe, 431 U.S. 145, 154 (1977).  Indeed, as pointed out by Respondent, the Supreme Court in

1    <u>Victor v. Nebraska</u>, 511 U.S. 1, 5 (1994), stated that not even the words "reasonable doubt" need

2    be stated by a trial court in its instructions to the jury.  Since there is no clearly established

3    Federal law requiring such a sua sponte instruction, this Court cannot conclude that the state

4    court's ruling was an "unreasonable application." <u>Musladin</u>, 549 U.S. at 77.  The claim should be

5    denied.

6        *2.  Alleged Ineffective Assistance by Trial Counsel to Request Instruction*

7        Petitioner next faults defense counsel for failing to request an instruction on third party

8    culpability.  The law governing ineffective assistance of counsel claims is clearly established.

9    <u>Canales v. Roe</u>, 151 F.3d 1226, 1229 (9th Cir. 1998.)  In a petition for writ of habeas corpus

10   alleging ineffective assistance of counsel, the court must consider two factors.  <u>Strickland v.</u>

11   <u>Washington</u>, 466 U.S. 668, 687 (1984); <u>Lowry v. Lewis</u>, 21 F.3d 344, 346 (9th Cir. 1994).  First,

12   the petitioner must show that counsel's performance was deficient, requiring a showing that

13   counsel made errors so serious that he or she was not functioning as the "counsel" guaranteed by

14   the Sixth Amendment. <u>Strickland</u>, 466 U.S. at 687.  The petitioner must show that counsel's

15   representation fell below an objective standard of reasonableness, and must identify counsel's

16   alleged acts or omissions that were not the result of reasonable professional judgment

17   considering the circumstances. <u>Id</u>. at 688; <u>United States v. Quintero-Barraza</u>, 78 F.3d 1344, 1348

18   (9th Cir. 1995).  Petitioner must show that counsel's errors were so egregious as to deprive

19   defendant of a fair trial, one whose result is reliable.  <u>Strickland</u>, 466 U.S. at 688.  Judicial

20   scrutiny of counsel's performance is highly deferential.  A court indulges a strong presumption

21   that counsel's conduct falls within the wide range of reasonable professional assistance.

22   <u>Strickland</u>, 466 U.S. 668, 687 (1984); <u>Sanders v. Ratelle</u>, 21 F.3d 1446, 1456 (9th Cir.1994).

23       Second, the petitioner must demonstrate prejudice, that is, he must show that "there is a

24   reasonable probability that, but for counsel's unprofessional errors, the result ... would have been

25   different," 466 U.S. at 694.  A court need not determine whether counsel's performance was

26   deficient before examining the prejudice suffered by the petitioner as a result of the alleged

27   deficiencies.  <u>Strickland</u>, 466 U.S. 668, 697 (1984).  Since the defendant must affirmatively

28   prove prejudice, any deficiency that does not result in prejudice must necessarily fail.

1    Here, Petitioner fails to demonstrate either that defense counsel committed error or that

2    the alleged error prejudiced him.  The jury was fully instructed on reasonable doubt and the

3    burden of proof.  The jury was instructed that it must find beyond a reasonable doubt that

4    Petitioner, not someone else, committed the murder.  In addition, defense counsel argued to the

5    jury that Key committed the murder.  He further argued that it was not the defense's burden to

6    prove Key committed the murder, only that it was sufficient to find Petitioner not guilty if Key's

7    possible guilt created a reasonable doubt that Petitioner committed the murder.  Therefore,

8    Petitioner cannot demonstrate error by counsel or prejudice resulting from defense counsel's

9    failure to request the instruction.  The claim should be rejected.

10    F.  Modification of Instructions

11    In his final claim for relief, Petitioner argues he was prejudiced by the trial court's failure

12    to sua sponte modify jury instructions on motive, consciousness of guilt as to suppression and

13    fabrication of evidence, and flight so that they also referred to thirty party culpability.  He further

14    claims defense counsel was ineffective in failing to request such instruction.

15    Petitioner also presented this claim on direct appeal to the Fifth DCA, where it was

16    denied in a reasoned decision.  (Resp't's Answer, Ex. A.)  Petitioner then presented it to the

17    California Supreme Court where it was summarily denied.  (Lodged Doc. 13.)  The Court must

18    "look through" the decision of the California Supreme Court to the reasoned decision of the

19    appellate court.  Ylst, 501 U.S. at 804-05 & n. 3.  The appellate court rejected the claim as

20    follows:

21        The trial court instructed the jury with consciousness of guilt instructions relating
       to motive (CALCRIM No. 370), suppressing or fabricating evidence (CALCRIM No.
22        371), and flight (CALCRIM No. 372). Appellant now contends that the trial court erred
       when it failed to sua sponte modify these instructions to relate to evidence of third party
23        culpability. In the alternative, appellant argues trial counsel was ineffective for failing to
       request those modifications. We disagree.
24
          As in the issue argued above, appellant's argument fails because, absent a party's
25        request, a trial court is not required to modify instructions to include third party
       culpability. (See, e.g., *People v. Henderson* (2003) 110 Cal.App.4th 737, 743-744
26        [defendant may be entitled to pinpoint instruction on flight of alleged third party but trial
       court not required to provide such instruction sua sponte].) And even if such instruction
27        was warranted, appellant would not have obtained a more favorable result had counsel
       requested and received the modified instructions. The jury was adequately instructed on
28        reasonable doubt and the burden of proof and would have acquitted appellant had it

28

1   entertained a reasonable doubt based on appellant's assertion that it was Key, not
    appellant, who murdered Steelman. (*People v. Abilez, supra,* 41 Cal.4th at pp. 517-518.)
2   Therefore, his ineffective assistance of counsel claim also fails.

3   (Resp't's Answer, Ex. A (footnotes omitted).)

4          As discussed in the previous claim, there is no clearly established Federal law requiring a

5   trial court to sua sponte instruct on third party culpability or sua sponte modify existing

6   instructions.  Thus, this Court cannot conclude that the state court's ruling was contrary to or an

7   unreasonable application of Federal law.  <u>Musladin</u>, 549 U.S. at 77.

8          Likewise, the state court reasonably concluded that defense counsel's alleged failure to

9   request modification of the instructions was harmless.  The jury was fully instructed on

10  reasonable doubt and the burden of proof.  Defense counsel forcefully argued that it was Key

11  who committed the murder, not Petitioner.  Had the instructions been modified to include third

12  party culpability, there is no likelihood the result would have been different.  Thus, the claim

13  should be denied.

14  ///

15  ///

16  ///

17  ///

18  ///

19  ///

20  ///

21  ///

22  ///

23  ///

24  ///

25  ///

26  ///

27  ///

28  ///

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS that the petition for writ of habeas corpus be DENIED WITH PREJUDICE.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after service of the Findings and Recommendation, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within fourteen (14) days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).


IT IS SO ORDERED.

**Dated:    November 30, 2012**                    _____ /s/ **Gary S. Austin**_____
                                                             UNITED STATES MAGISTRATE JUDGE

30